IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

LORETTA M. HOOK,
    Plaintiff,

v.                            Civil Action No. 1:14CV126
                             (The Honorable Irene M. Keeley)

COMMISSIONER OF SOCIAL SECURITY,
    Defendant.

## REPORT AND RECOMMENDATION/OPINION

This action is for judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant" and sometimes "Commissioner"), denying Loretta M. Hook's ("Plaintiff") claim for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for SSI on September 10, 2010, alleging disability since April 15, 2006, due to fibromyalgia, migraine headaches, and asthma (R. 158-61, 178). The state agency denied Plaintiff's applications initially and on reconsideration (R. 56-57, 62-66, 69-75). Plaintiff requested a hearing, which Administrative Law Judge Marc Mates ("ALJ") held on October 23, 2011, and at which Plaintiff, represented by counsel, Britt Clark, and Mr. Gunneau, a vocational expert ("VE") testified (R. 38-55). Plaintiff amended her alleged onset date to August 26, 2010, at the hearing (R. 173). On November 30, 2012, the ALJ entered a decision finding Plaintiff was not disabled (R. 21-32). Plaintiff filed a request for review with the Appeals Council (R. 14-17). On February 20, 2014,

the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 8-10).

## II. FACTS

Plaintiff was born on May 2, 1970, and was forty-two (42) years old on the date of her administrative hearing. Plaintiff graduated from high school (R. 179). Plaintiff's past employment includes work as an in-home caretaker and a laborer in a poultry processing plant (R. 179).

On March 30, 2006, Plaintiff saw Dr. Zach Perdue for headaches. Plaintiff had done well on Topamax until two (2) months ago, when she began to experience "severe unilateral headaches with noise and light sensitivity." Plaintiff had been placed on Nexium for GERD; she got a headache every time she took Nexium. Plaintiff had experienced nine (9) headaches that month. Three had been brief; three had been accompanied by visual auras; and three had been so severe that Plaintiff had considered going to the emergency room. Plaintiff had a "good deal of noise and light sensitivity." Dr. Perdue noted a normal examination. He prescribed amitriptyline and Vicodin and instructed Plaintiff to follow up in six (6) or seven (7) weeks (R. 496).

Plaintiff returned to see Dr. Perdue on June 20, 2006, for her headaches. Plaintiff stopped taking amitriptyline because she experienced sedation and lack of energy the morning after each dose. She had separated from the man who was the "source of most of the stress in her life." The absence of this stress was "very helpful;" Plaintiff was having "essentially no headaches." She was no longer having adverse effects from Topamax. Dr. Perdue noted a normal examination. Dr. Perdue noted that Plaintiff's headaches became worse "because of a difficult social situation rather than any intrisic change in her migraine propensity." He maintained her on her "current regimen" (R. 495).

On September 26, 2006, Plaintiff told Dr. Perdue that changes in weather and odors "often precipitate[d] her headaches." In general, Plaintiff was "happy" with the level of headache control. Plaintiff's examination was normal. Dr. Perdue maintained her current dosage of Topamax and prescribed a refill of Vicodin (R. 494).

Plaintiff told Dr. Perdue, on March 27, 2007, that she was feeling "constantly tired." She took 25 mg of Topamax at night. Some of her headaches were "very brief lasting only about 20 minutes;" however, Plaintiff was "quite uncomfortable" during those minutes. Some headaches were for "somewhat longer duration." Dr. Perdue noted a normal examination. He reviewed Plaintiff's chart back to 2000 and noted that a calcium channel blocker may work to control Plaintiff's headaches. Dr. Perdue prescribed Verapamil and instructed Plaintiff to follow up in four (4) months (R. 493).

On July 6, 2007, Plaintiff told Dr. Perdue that Verapamil seemed to work well for her headaches but that it caused constipation. She took Lactulose to relieve this. Plaintiff took 25 mg of Topamax daily; she needed "an occasional hydrocodone when the headaches bec[ame] severe." Dr. Perdue noted a normal examination, prescribed Nalfon, and instructed her to follow up in four (4) months (R. 465, 492).

Plaintiff returned to Dr. Perdue on November 29, 2007 for her headaches. She stated that she had been doing "fairly well" on Topamax and Verapamil; however, she had been feeling "very fatigued." Upon examination, Dr. Perdue noted that Plaintiff was "rather pale and appeared to be somewhat listless." He noted that her headache control was "relatively good" as she had only had one (1) "really severe headache in the past four months." He instructed Plaintiff to follow up in six (6) months (R. 462, 491).

On September 5, 2008, Plaintiff saw Dr. Joseph Hahn with complaints of neck pain, headache, weakness, and no appetite. Dr. Hahn noted a normal examination. He assessed neck pain and prescribed Skelaxin and Lortab (R. 458). Two weeks later, Plaintiff returned with a headache, lots of drainage, and lots of pressure. Upon examination, Phyisican's Assistant ("PA") Kelsey Meador noted that Plaintiff's ears were red and bulging, and her throat was red. She diagnosed sinusitis, gave Plaintiff a shot of Rocephin, and prescribed Omnicef (R. 456-57).

Plaintiff returned to Hahn Medical Practices on December 4, 2008, with complaints of headache and nasal drainage. She had been having headaches behind her eyes and temple area, and had been feeling fullness and pressure in her ears. Upon examination, Plaintiff's ears were bulging and bright red. Her throat had erythemia and drainage. Her nose was inflamed. PA Kelsey Hott diagnosed sinusitis and gave Plaintiff a shot of Rocephin (R. 451). Plaintiff had a follow-up on December 10, 2008. She was feeling "somewhat better;" her coughing and sinus congestion was getting better. PA Hott gave her a shot of Rocephin and instructed Plaintiff to return in one (1) week (R. 449).

On March 13, 2009, Plaintiff saw PA Hott with complaints of nasal drainage, headache, coughing, and chest and sinus congestion. Her headaches were located "in the front, behind her eyes." Plaintiff reported that she had a lot of pressure behind her eyes. Upon examination, PA Hott heard rhonchi in Plaintiff's lower lungs, "more prominent on the left side." Plaintiff's throat had drainage; her nose was inflamed. PA Hott diagnosed sinusitis and bronchitis, decreased Plaintiff's Cymbalta dosage, and prescribed Omnicef (R. 445-46).

Plaintiff returned to PA Hott with complaints of a headache on March 31, 2009. Upon examination, she had some drainage in her throat, which was red. Her nose was inflamed, and her ears

4

were bulging. PA Hott assessed sinusitis and headache, and gave Plaintiff a shot of Rocephin. She prescribed Loricet, Toradol, and Phenegan (R. 442).

On April 3, 2009, Plaintiff returned to PA Hott with complaints of nasal drainage and coughing. Upon examination, PA Hott noted that Plaintiff's ears were bulging and red, her nose was inflamed, and her throat was red and had some drainage. PA Hott diagnosed sinusitis and depression. She prescribed Omnaris and Cymbalta. On May 4, 2009, Plaintiff's Cymbalta dosage was increased because of pain in her legs (R. 441).

On August 10, 2009, Plaintiff saw PA Hott with complaints of sinus congestion, headache, drainage, and sore throat. Upon examination, PA Hott noted that Plaintiff's ears were bulging and red. She had an inflamed nose and yellowish drainage in her throat. PA Hott diagnosed sinusitis and prescribed Rocephin and Veramyst (R. 316, 440).

Plaintiff saw PA Hott on September 3, 2009, with complaints of sore throat, sinus congestion, headache, and right earache. Upon examination, PA Hott noted that Plaintiff's eyes showed signs of erythematous conjunctiva. Plaintiff's ears were bulging and red, she had an inflamed nose, and had yellowish drainage in her throat. PA Hott diagnosed sinusitis, conjunctivitis, and migraine (R. 315).

On October 20, 2009, Plaintiff saw PA Hott. PA Hott noted a normal examination and assessed headaches. She prescribed Toradol (R. 313).

Two days later, on October 22, 2009, Plaintiff returned to PA Hott with complaints of a headache. Upon examination, PA Hott noted that Plaintiff's ears were bulging and red. Her nose was inflamed and she had drainage in her throat. PA Hott assessed sinusitis and headaches, and prescribed Toradol (R. 312).

On December 8, 2009, Plaintiff returned to PA Hott with complaints of drainage, coughing, sinus congestion, and sore throat. Upon examination, PA Hott noted that Plaintiff's ears were bulging and red. She had yellow drainage in her throat, and her nose was inflamed. PA Hott diagnosed sinusitis and prescribed Rocephin (R. 311).

Plaintiff saw PA Hott on December 15, 2009, for a follow-up for sinusitis. Plaintiff reported that she was "doing better." Upon examination, PA Hott noted that Plaintiff did have some fluid in her ears, but that otherwise her examination was normal. She assessed sinusitis and ET dysfunction, and prescribed Claritin (R. 310).

On January 1, 2010, Plaintiff presented to the emergency room at Rockingham Memorial Hospital with a complaint of epigastric pain. Plaintiff described her pain as feeling "like a hard knot" and that it "puff[ed] out and swell[ed]." She had been experiencing pain for months. Plaintiff had been experiencing diarrhea but not vomiting. Dr. Alexander Baer noted a normal examination. He diagnosed abdominal pain and diarrhea. Plaintiff was discharged on "antibiotics, analgesia, and antiemetics" (R. 287-88, 522-23).

On January 28, 2010, Plaintiff underwent an ultrasound of her gallbladder at Grant Memorial Hospital. Dr. Jong Kim noted that Plaintiff had no gallstones, that her liver was normal, and that her common duct was "unremarkable" (R. 268, 393, 426).

On March 2, 2010, Plaintiff underwent a kinevac hepatobiliary scan at Grant Memorial Hospital. This scan demonstrated "homogeneous liver activity." Plaintiff's "ejection fraction [was] negligible at 12%." Dr. Kim's impression was for severe gallbladder dysfunction (R. 257, 267, 280, 392, 422).

On March 9, 2010, Plaintiff saw Dr. Anil Makani for a consultation regarding a dysfunctional gallbladder. Plaintiff had been sick for the past eight (8) months; it had been "getting worse." Plaintiff had upper epigastric pain that sometimes went to her back. She had nausea and diarrhea but no vomiting. Plaintiff had been taking Phenergan (R. 261). Dr. Makani noted a normal examination and assessed laproscopic possible open cholecystectomy and biliary dyskinesia (R. 262, 276-78, 386-88, 423-25).

On March 30, 2010, Dr. Makani performed a laparoscopic cholecystectomy, intraoperative cholangiogram, and laparoscopic adhesiolysis on Plaintiff. Dr. Makani noted that Plaintiff had "many small blood vessels going from the liver to the gallbladder." He put clips in those before dividing them. Plaintiff tolerated the procedure well and was transferred to the recovery room in stable condition. She was discharged that same day (R. 258-60, 271-72, 381-83, 394-95, 415-17).

On April 15, 2010, Plaintiff saw PA Hott with complaints of body aches, vomiting, diarrhea, and abdominal pain. Upon examination, PA Hott noted that Plaintiff had hyperactive bowel sounds and tenderness in the epigastric area. She assessed gastroenteritis and headache, and prescribed Phenegran and Lortab (R. 309).

Plaintiff returned to PA Hott on July 1, 2010, for suture removal. PA Hott noted that Plaintiff had a normal examination and assessed a stitch abscess (R. 308).

On July 21, 2010, Plaintiff saw PA Hott with complaints of back pain when she breathed. She also was having a lot of muscle aches and joint pain. Plaintiff reported that Cymbalta was not working as well as it had previously. Upon examination, PA Hott noted rhonchi and wheezing in the upper lobe of Plainitff's left lung. She assessed pleurisy, bronchitis, and fibromyalgia. PA Hott noted that

Plaintiff's insurance would not pay to increase her Cymbalta dosage, so she discontinued Cymbalta and prescribed Savella, Flexeril, and Lortab (R. 307).

On August 21, 2010, Plaintiff returned to see PA Hott with complaints of chest pain "all the way through shoulder blade" and epigastric pain. Plaintiff had taken three (3) Tagamet to try to help the pain. Upon examination, PA Hott noted that Plaintiff's abdomen was tender. She diagnosed abdominal pain, bloating, and an adverse reaction to Savella. PA Hott prescribed Reglan (R. 306).

Plaintiff saw PA Hott on September 13, 2010, with complaints of sinus congestion, earache, sore throat, drainage, cough, and headache. Upon examination, PA Hott noted that Plaintiff had fluid in her ears, pressure over the maxillary sinus, and yellow and green drainage in her throat. PA Hott diagnosed sinusitis (R. 305).

On September 28, 2010, Plaintiff completed a Function Report–Adult. On a typical day, Plaintiff arose at 6:30 a.m. so that she could wake up her seven-year-old for school. On "painful" days she sat in her recliner and watched television. On "good" days she did "as much laundry, dishes, housework" as possible. Plaintiff's conditions affected her sleep because her legs hurt at night. Her conditions caused her to take longer to dress, bathe, care for her hair, and shave (R. 194). Plaintiff prepared her own meals; she cooked at least once a week. On painful days Plaintiff prepared sandwiches or "something simple." If she could cook, she prepared meat, vegetables, and fruit. As for household chores, Plaintiff did laundry, ran the vacuum, made the beds, and cooked, but only on days when she did not "hurt so much." Her sons helped her do some chores (R. 195). Plaintiff could drive a car and ride in a car; her oldest son would drive her if she had taken pain medication. She shopped once a month for groceries. Plaintiff was able to pay bills, count change, handle a savings account, and use a checkbook and money orders (R. 196). As for hobbies and interests, Plaintiff liked

to paint and read with her seven-year-old son. She did not do these activities as often as she once did, but she tried to paint "a little every week." Plaintiff watched television with her sons, read with her younger son, and spent time with her parents daily. She also talked to others on the telephone. Plaintiff went to church, the grocery store, and her doctor's office on a regular basis (R. 197). Plaintiff reported that she could only lift up to ten (10) pounds and could walk for 100 yards before needing to rest for ten (10) minutes (R. 198).

On November 22, 2010, K. Sarpolis completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Sarpolis determined that Plaintiff could occasionally lift and carry twenty (20) pounds; frequently lift and carry ten (10) pounds; stand, walk, and sit for approximately six (6) hours during an eight (8)-hour workday; and had no limitations with pushing and pulling (R. 328). Plaintiff needed to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation (R. 331). Dr. Sarpolis found that Plaintiff was partially credible and that caring for a small child was "not consistent with extreme limits" (R. 332).

Plaintiff saw PA Hott on November 29, 2010, with complaints of pain in her left hip and ribs. Plaintiff had fallen one (1) week ago. Upon examination, PA Hott noted that Plaintiff had lumbar tenderness. She assessed back pain and prescribed Prednisone and Flexeril (R. 344).

On December 20, 2010, Plaintiff returned to see PA Hott with complaints of pain in her left foot. She had been experiencing pain for three (3) weeks, and her foot felt bruised. PA Hott noted a normal examination of Plaintiff. She assessed tendonitis of the foot and fibromyalgia, and prescribed naprosyn and Lortab (R. 343).

Dr. A. Rafael Gomez reviewed Dr. Sarpolis' Physical Residual Functional Capacity Assessment on January 31, 2011, and affirmed same (R. 350).

9

On February 7, 2011, Plaintiff returned to see PA Hott with complaints of abdominal pain, sore throat, and nausea. Plaintiff had also been experiencing pain in her right shoulder and the right side of her neck, with decreased range of motion. Upon examination, PA Hott noted that Plaintiff's nose was inflamed and bleeding. She assessed flu-like illness/gastroenteritis, fibromyalgia, and right neck and shoulder pain. She prescribed Tamiflu (R. 377).

James W. Bartee, Ph.D., completed a Psychiatric Review Technique of Plaintiff on February 15, 2011. He found that Plaintiff had no medically determinable mental impairment (R. 351). Specifically, Dr. Bartee noted that none of Plaintiff's providers "appreciate[d] a psychiatric or mental condition, or suggest eval or f/u for same" (R. 363).

On June 13, 2011, Plaintiff saw PA Hott with a headache that had lasted for two (2) days. PA Hott noted that a CT scan in 2005 had shown a cyst on Plaintiff's occupital area where her headache was located. Plaintiff requested a repeat CT scan. PA Hott noted a normal examination, diagnosed a migraine, and prescribed Toradol and Phergran (R. 376).

On June 14, 2011, Plaintiff presented to the emergency room at Rockingham Memorial Hospital with a headache. She reported that the migraine was in the "typical location" where she always got them, specifically, the posterior right side of her head. Plaintiff had seen her primary care physician the day before; that physician had provided her with Toradol and Phenergan. Those medications helped, but the headache came back at night. Plaintiff took two (2) Vicodin, which did not provide any relief. Dr. Christine Burger noted a normal examination (R. 531-32). While there, Plaintiff underwent a CT scan of her brain. Dr. Joseph Behl's impression was for "[n]egative unenhanced CT scan of the head. No intracranial mass, hemorrhage, or CT evidence of acute infarct"

(R. 378, 439, 533). Plaintiff was given two (2) Percocet, and Dr. Burger assessed headache, acute. Plaintiff was discharged home in "fair, improved condition" (R. 532).

Plaintiff saw a provider at Hahn Medical Practices on September 2, 2011. She needed a prescription for Cymbalta for her fibromyalgia. Upon examination, the provider noted that Plaintiff had some edema, lumbar and cervical tenderness, and tender points in her bilateral lower legs and feet and her neck. The provider diagnosed fibromyalgia and prescribed Cymbalta, Neurontin, and Flexeril (R. 374).

On October 13, 2011, Plaintiff returned to Hahn Medical Practices with complaints of sinus congestion, drainage, headache, and sore throat. Upon examination, the provider noted that Plaintiff's nose was inflamed and that her throat was red with some drainage. The provider diagnosed an upper respiratory infection and sinusitis (R. 433).

On October 23, 2011, Plaintiff presented to the emergency room at Rockingham Memorial Hospital with complaints of a headache and sinus problems. She reported that she had recently been diagnosed with a sinus infection and had been prescribed Augmentin; she stopped taking the Augmentin because it was not helping. Plaintiff stated that she normally received a shot of Rocephin for sinus infections; however, she had not received that from her primary care physician. She noted that she had facial pressure and pain "as well as a headache in her right frontal area and right maxillary sinus." Dr. David Shank and PA Dana Landacre noted a normal examination. They diagnosed acute sinusitis and headache. Plaintiff was given an IV dose of Rocephin along with Toradol and Phenergan. She was discharged home with a prescription for Zithromax (R. 535-38).

Plaintiff saw Dr. Hahn on January 19, 2012, with complaints of pain and swelling in her right leg and pain in her stomach. Her stomach felt like it had a knot in it. Plaintiff was having nausea after

eating. Upon examination, Dr. Hahn noted that Plaintiff's abdomen was tender and that she had pain in her right knee upon palpation. He assessed posterior right knee pain that could be a baker's cyst, constipation, and chronic fatigue. He prescribed Lactulose, directed Plaintiff to drink more water, and ordered X-rays of Plaintiff's right knee (R. 427).

On February 20, 2012, Plaintiff underwent a popliteal ultrasound at Grant Memorial Hospital. Dr. Jong Kim noted that there was no "focal fluid collection" (R. 408, 431).

On February 17, 2012, Plaintiff saw Dr. Hahn with lower right leg pain. She stated that she had a knot in her leg. Upon examination, Dr. Hahn noted that Plaintiff had a 1.5 cm "mobile mass" on her right thigh and tenderness in her right popliteal. He diagnosed a lipoma, constipation, and anemia. Plaintiff was directed to take Lactulose. Dr. Hahn injected the mass with lidocaine and surgically removed it (R. 428).

Plaintiff saw Dr. Makani for a consultation regarding anemia on March 1, 2012. She reported that she had been very tired and experiencing acid reflux and epigastric pain for the past five (5) weeks (R. 410). Dr. Makani noted a normal examination. He assessed anemia, unspecified iron deficiency, and recommended that Plaintiff undergo a colonoscopy (R. 412).

On March 2, 2012, Plaintiff underwent an MRI of her right knee at Grant Memorial Hospital. Dr. Myung Kim's impression was as follows: "Large horizontal tears are seen at the mid body and posterior limb of the medial meniscus" (R. 409, 434).

Plaintiff returned to Dr. Hahn on March 8, 2012, with "a lot of pain in both legs." Upon examination, the provider noted that Plaintiff was positive for pain in her posterior medial joint and that she had some edema. Dr. Hahn assessed "MMJ R knee." He recommended that Plaintiff continue taking her pain medications and have a consultation with an orthopedist (R. 432).

On March 14, 2012, Plaintiff saw Registered Nurse ("RN") Kimberly Hahn "in referral regarding her bilateral knee pain." Plaintiff had been experiencing right knee pain for several months. She experienced tightness with flexion, popping, and feelings of instability. She had also developed pain "over the anterior aspect of the left leg" over time. Plaintiff took hydrocodone "on an as needed basis" to manage her pain. Upon examination, RN Hahn noted that Plaintiff had "tenderness over the medial joint line of the right knee." She had a positive McMurray's sign. Plaintiff could fully extend and flex her right knee; however, she had some stiffness with flexion. Plaintiff had tenderness over her anterior left knee. Plaintiff underwent an MRI of her right knee. Dr. Joseph Hahn's assessment was "[m]ild patellofemoral joint disease; otherwise, normal X-ray." RN Hahn assessed right knee pain with medial meniscus tear and left anterior knee pain. Plaintiff did not wish to undergo surgery because she had been having problems with her stomach and because she was in the "process of workup for pre cervical cancer." RN Hahn injected Plaintiff's right knee with "Kenalog 40 mg with Marcaine .50% without difficulty." Plaintiff was to return in six (6) weeks (R. 483-85).

Plaintiff returned to see RN Hahn on April 25, 2012. She reported that the injection had only provided her relief for two (2) weeks; her symptoms were now "more bothersome to her." Plaintiff had been experiencing "increasing pain over the medial aspect and a catching sensation." She felt at times that her knee was going to give out on her. Plaintiff was not interested in further workup of her left knee until treatment of her right knee was completed. Upon examination, RN Hahn noted that Plaintiff had mild patellofemoral crepitus bilaterally and minimal medal right knee joint line tenderness. She had "pain with McMurray's." An MRI was taken of Plaintiff's right knee, which showed a "medial meniscus tear without evidence for significant degenerative change or other acute

processes." RN Hahn assessed bilateral knee pain and right meniscus tear. Plaintiff decided to undergo a right knee arthroscopy for partial medial meniscectomy (R. 502-03, 517-18).

On May 7, 2012, Plaintiff underwent a right knee arthroscopy with partial medial meniscectomy at Grant Memorial Hospital. After the operation, Dr. Hahn diagnosed right knee pain and medial meniscus tear. A tear in Plaintiff's medial meniscus "was not amenable to repair." After the procedure, Plaintiff was taken to the recovery room "in stable condition without complication" (R. 500-01, 515-16.) In a "To whom it may concern" letter dated May 7, 2012, Dr. Hahn certified that Plaintiff was under his care. Furthermore, he stated that "[i]n order to avoid aggravation of her condition, I recommend that she be excused from activity started 05/07/2012 until 05/11/2012." Plaintiff had undergone a right knee arthroscopy on May 7, 2012 (R. 486).

Plaintiff saw Dr. Hahn on May 30, 2012, for a follow-up appointment after her right knee arthroscopy. She was "doing extremely well" and stated that her pain had resolved. Plaintiff "still ha[d] a little bit of medial-sided pain but no new symptoms." Upon examination, Dr. Hahn noted that Plaintiff had some mild edema and effusion, but no signs of infection. Dr. Hahn told Plaintiff that he would see her on an as needed basis and that she could return to activities "as she feels comfortable." He recommended that Plaintiff continue to ice and elevate her knee if she noticed swelling. Overall, Plaintiff was "happy to proceed and pretty happy with her results" (R. 498).

Plaintiff saw a provider at Hahn Medical Practices on September 10, 2012, with complaints of neck pain, leg pain, sneezing, and a headache that had lasted for four (4) days. Upon examination, the provider noted that Plaintiff had drainage in her nose and throat. The provider assessed fibromyalgia and directed Plaintiff to continue taking her pain medication and muscle relaxer as prescribed (R. 547).

On September 13, 2012, Plaintiff presented to the emergency room at Rockingham Memorial Hospital with complaints of neck and back pain. She had been experiencing pain for a week, and she experienced pain when she "lean[ed] her head back and t[ook] a drink of water." Plaintiff's primary care physician thought that the pain was caused by an exacerbation of her fibromyalgia. Her pain was worse with movement and was alleviated by "lying and resting still." Upon examination, Dr. Ian Steines and PA Dena Helmick noted that Plaintiff had "diffuse pain throughout the neck, which [was] mainly on the left lateral aspect of the neck." Plaintiff also had bilateral shoulder pain that was worse on her left side, "worse with range of motion of the shoulders, this does go down diffusely throughout her back to approximately the mid aspect of her back, still located on the left side, worse with movement such as bending and twisting motions." Dr. Steines and PA Helmick diagnosed musculoskeletal back pain and fibromyalgia, prescribed Valium, and instructed Plaintiff to continue taking Valium (R. 541-43).

Plaintiff returned to Hahn Medical Practices on September 25, 2012, with complaints that she was still experiencing headaches and had no energy. She was positive for tender points in her bilateral upper arms, thighs, back, and lower legs. The provider assessed migraine variant, fibromyalgia, and depression. Plaintiff was instructed to increase her Topamax dosage and to continue taking her current prescriptions (R. 546).

On October 18, 2012, Plaintiff returned to Hahn Medical Practices to have physical papers completed. PA Stephanie Miller assessed fibromyalgia and prescribed Imitrex (R. 544). That same day, PA Miller completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) for Plaintiff. She opined that Plaintiff could occasionally lift and carry five (5) pounds and frequently lift and carry less than five (5) pounds. Plaintiff's bilateral grips were weak and she dropped objects

because of "decreased strength." She could stand and walk for three (3) hours in an eight (8)-hour workday, for thirty (30) minutes at a time, because of "general weakness in legs" (R. 551). Plaintiff could sit for four (4) hours in an eight (8)-hour workday, for thirty (30) minutes at a time, because of "increased pain to legs while in seated position." Plaintiff could never climb and crawl; she could occasionally stoop, crouch, and kneel; and she could frequently balance. She needed to avoid temperature extremes, humidity, and vibrations (R. 552). PA Miller noted that "extreme temperatures exacerbate pain as does humidity" and that "vibration causes numbness." Plaintiff could frequently feel and occasionally reach, handle, and finger. PA Miller stated that "increased usage of hands whether it be gross or fine manipulation causes exacerbation of pain and numbness in hands" (R. 553). Plaintiff suffered from migraine and muscle tension headaches; these caused symptoms of anorexia, nausea and vomiting, irritability, photophobia, pupillary constriction, and injection of conjunctiva. Plaintiff experienced such headaches several times per week, and each headache lasted approximately twenty-four (24) hours (R. 555). PA Miller stated that Plaintiff was unable to work while suffering a headache because her medication caused drowsiness "making it unsafe to drive, operate machinery" (R. 556).

Administrative Hearing

At the administrative hearing, Plaintiff testified that she had a driver's license, but did not feel like she was "safe to drive" (R. 42-43). Her younger son's father had driven her to the hearing; she had experienced "discomfort" during the drive (R. 43). Plaintiff took Cymbalta and Gabapentin for depression, pain, and fibromyalgia. Those helped; Plaintiff thought she would "be a lot worse" without those medications. Plaintiff experienced spasms in her neck, shoulders, back, legs, arms, and hands. She experienced headaches approximately three (3) times per week; those would last all

16

day. She took Topamax for her headaches (R. 44). To relieve her headaches, Plaintiff would lie on

an ice bag, which made her sleep. She took hydrocodone or lortab to help her sleep; she slept four

(4) to five (5) hours at night. Plaintiff fell asleep "quite often" during the day, for thirty (30) minutes

at a time, three (3) to four (4) times per day. She used an advent inhaler twice a day (R. 45).

Plaintiff took Tentoprazol for acid reflux. She could not stand being in cold or heat; perfumes

bothered her and gave her "really bad headaches;" and she could not take "anything with ibuprofen"

(R. 46).

Plaintiff stated that she could stand or walk for only fifteen (15) minutes at a time; she used

to walk for exercise but could not do that anymore. She could sit but had to "move around a lot."

Plaintiff was unable to bend her legs to squat. She could not grip things with her hands "very well,"

and she could not write "for a long period of time" (R. 46). Plaintiff could not fasten buttons and

zippers "very well." She could carry two (2) gallons of milk at a time, one in each hand. Plaintiff

took a long time to complete her personal care. On a typical day, she would wake up her younger

son for school, then sit and watch television and "fall asleep" (R. 47). Plaintiff did laundry on

"good" days; there were "not very many good days." Her oldest son helped "a lot" by doing most of

the cooking and grocery shopping (R. 48). Plaintiff had one (1) good day a week. On bad days, she

would sleep. She needed to elevate her legs and spent most of her time on her reclining sofa (R. 50).

The ALJ then asked the VE the following hypothetical question:

Please assume an individual the same age, education and work experience as the claimant limited to light work. Lift 20 pounds occasionally, 10 pounds frequently. Sit/stand/walk six hours in an eight-hour workday.

This individual should avoid climbing, crawling. Other postural activities to include stooping, balancing, crouching occasionally. No concentrated exposure to temperature extremes, fumes, odors, dust, gases, poor ventilation, humidity, vibrations, and hazards.

Can this hypothetical individual do the past work of the claimant?

The VE responded that such an individual could not perform Plaintiff's past work. However, such an individual could perform work as a garment sorter, with 178,000 jobs nationally and 1,500 regionally; and price marker, with 319,000 jobs nationally and 1,675 regionally (R. 52).

The ALJ then asked the following hypotheticals:

There is an assessment completed by Ms. Miller at Exhibit 26-F. She indicates that this individual is limited to lifting less than three pounds occasionally or frequently, standing/walking three hours total. Sitting four hours in an eight-hour workday. Can such an individual perform any full-time work?

. . .

If I asked you to assume someone of Ms. Hook's age, education, work experience and ask you to assume the full credibility of the allegations to which she's testified today including that she has only one good day a week and just has to lie down. In fact, she said she lies down during the day for half hour at a time, 3-4 times a day. She has migraines three times a week that last all day and would presume with concentration, persistence, and pace. Could such an individual perform any work?

The VE, in both instances, said that such an individual could not perform any work (R. 53).

### III.  ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920 (1997), ALJ Mates made the following findings:

1.  The record does not establish that the claimant has engaged in substantial gainful activity since August 26, 2010, the application date (20 CFR 416.971 *et seq.*).

2.  The claimant has the following severe impairments: fibromyalgia, bilateral knee difficulty, and asthma (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

18

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), except the claimant cannot climb or crawl and can only occasionally balance, stoop, kneel, or crouch. Further, the claimant must avoid exposure to temperature extremes, vibration, pulmonary irritants (such as fumes, dust, gases, and odors), and hazards (such as moving machinery or unprotected heights).

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was born on May 2, 1970 and was 40 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not material to the determination of disability, because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since August 26, 2010, the date the application was filed (20 CFR 416.920(g)).

(R. at 21-32.)

## IV. DISCUSSION

### A.    Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the Secretary's decision, the reviewing court must also consider whether the administrative law judge applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

**B.    Contentions of the Parties**

Plaintiff contends:

1.    The ALJ's credibility analysis was deficient, particularly in light of Plaintiff's severe impairment of fibromyalgia; and

2.    The ALJ erred in failing to apply fibromyalgia ruling SSR 12-2p when evaluating Plaintiff's claim.

(Plaintiff's Brief at 6-14.)

The Commissioner contends:

1.    Substantial evidence supports the ALJ's credibility finding; and

2.    Substantial evidence supports the ALJ's findings regarding Plaintiff's fibromyalgia.

(Defendant's Brief at 7-12.)

**C.    SSR 12-2p and Fibromyalgia**

Plaintiff argues that the "ALJ did not conduct a proper assessment of [her] fibromyalgia at each step of the five step sequential evaluation as required by SSR 12-2p." (Plaintiff's Brief at 11.)

Specifically, she asserts that the ALJ "failed to properly assess [her] case at Steps 3, 4, or 5 as required by SSR 12-2p." (Id. at 12.) According to Plaintiff, "the ALJ did not only did not [sic] mention the impairment of fibromyalgia in his Step 3 analysis, but he also did not compare [her] symptoms to the most obvious listing that fibromyalgia might equal–the one actually mentioned in SSR 12-2p 14.09D, the listing for inflammatory arthritis." (Id. at 12-13.) Plaintiff also asserts that the ALJ failed to consider the impact of her fibromyalgia when assessing her credibility, which duplicates her first argument for relief.

As the Fourth Circuit has explained,

[f]ibromyalgia is a rheumatic disease with . . . symptoms including "significant pain and fatigue," tenderness, stiffness of joints, and disturbed sleep. . . . Doctors diagnose fibromyalgia based on tenderness of at least eleven of eighteen standard trigger points on the body. . . . "People with rheumatoid arthritis and other autoimmune diseases, such as lupus, are particularly likely to develop fibromyalgia." . . . Fibromyalgia "can interfere with a person's ability to carry on daily activities." . . . "Some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not."

Stup v. UNUM Life Ins. Co., 390 F.3d 301, 303 (4th Cir. 2004) (internal citations omitted). The purpose of Social Security Ruling ("SSR") 12-2p is to provide "guidance on how [the Administration] develop[s] evidence to establish that a person has a medically determinable impairment (MDI) of fibromyalgia (FM), and how [the Administration] evaluate[s] FM in disability claims and continuing disability reviews under titles II and XVI of the Social Security Act (Act)." 2012 WL 3104869, at *1 (July 25, 2012).

When evaluating whether a claimant meets one or more of the listed impairments, the ALJ must identify the relevant listings and then compare each of the listed criteria to the evidence of the claimant's symptoms. Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). "This requires an ALJ to compare the plaintiff's actual symptoms to the requirements of any relevant listed impairments

in more than a "summary way." Id. at 1173. "The ALJ is required to give more than a mere conclusory analysis of the plaintiff's impairments pursuant to the regulatory listings." Fraley v. Astrue, No. 5:07CV141, 2009 WL 577261, at *25 (N.D. W. Va. Mar. 5, 2009) (citing Warner v. Barnhart, Civil Action No. 1:04-cv-8, Docket No. 18 at 7-9, 11 (Final Order of Stamp, J., filed Mar. 29, 2005)). The Administration has provided the following guidance as to how to consider fibromyalgia at Step Three of the sequential process:

> FM cannot meet a listing in appendix 1 because FM is not a listed impairment. At step 3, therefore, we determine whether FM medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment.

SSR 12-2p, 2012 WL 3104869, at *6.

> In his Step Three analysis, the ALJ wrote:

> Specific attention was paid to section 1.00 of the medical listings for musculoskeletal disorders, section 3.00 for respiratory impairments, and section 11.00 for neurological disorders.

> The evidence of record does not establish ineffective ambulation or an inability to perform fine or gross movements effectively. The claimant does not require an assistive device to ambulate that involves the use of both upper extremities; and the record does not establish any impairment of either upper extremity that interferes with fine or gross manipulation.

> The claimant underwent dissection of a lipoma on her right leg in early 2012, but is not reported to have any residual problems requiring treatment. Further, she was shown to have a tear of her right meniscus on MRI in March 2012 and underwent right knee arthroscopy with partial meniscectomy on May 7, 2012. The only restriction given postoperatively was an excuse from activity until May 11, 2012. The claimant was doing "extremely" well on orthopedic follow-up on May 30, 2012, and there is no evidence of further orthopedic follow-up, suggesting that the claimant improved after surgery. The left knee x-ray taken in March 2012 showed only "mild" patellofemoral change and no evidence of acute fracture, dislocation, or other bony injury; and review of the record evidence reveals no report of imaging of the cervical or lumbar spine. Further, other than tenderness, some stiffness with flexion of the right knee, and "mild" crepitus of the left knee reported on March 14, 2012, there are

minimal clinical findings of significant abnormality of the spine or any extremity. On emergency room examination on August 15, 2012, the claimant had no tenderness of her back and moved all extremities without focal deficit. No abnormality of the neck, back, or extremities was reported on examination at Hahn Medical Practice on February 7, 2011. On follow-up on June 13, 2011, the claimant had no spinal tenderness on examination and exhibited normal range of motion of her extremities. On emergency room examination on June 14, 2011, the claimant had intact sensation and 5/5 strength in all four extremities. Nurse Kahn's examination on March 14, 2012 showed no laxity with varus or valgus testing, and the claimant was neurovascularly intact. On emergency room examination on September 13, 2012, there was some spinal tenderness on examination, but normal range of motion and good strength in the bilateral upper and lower extremities.

In the absence of evidence of major dysfunction of a joint, reconstructive surgery or surgical arthrodesis of a major weight bearing joint, nerve root compression accompanied by sensory or reflex loss, spinal arachnoiditis, lumbar spinal stenosis resulting in pseudoclaudication, amputation, non-union of a fracture, or soft tissue injury under continuing surgical management, no listing level musculoskeletal impairment is found to exist. Further, in the absence of evidence of significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station, the criteria of section 11.14 for peripheral neuropathies has not been satisfied. Specifically, the evidence of record does not establish persistent disorganization of motor function, interference with locomotion, and/or interference with the use of fingers, hands, and arms. The claimant has not undergone electromyographic testing to determine any neuropathy, and she has not required referral to a neurologist.

Under section 3.00 for respiratory disorders, the evidence of record does not establish FEV1, FVC, or arterial blood gas values equal to or less than the values specified in the tables, asthma, cystic fibrosis, pneumoconiosis, bronchiectasis with impairment of pulmonary function due to extensive disease or episodes of bronchitis, pneumonia, or hemoptysis occurring at least once every two months or six times a year, mycobacterial, mycotic, or other persistent lung infections, cor pulmonale, a sleep related breathing disorder, or lung transplant.

The claimant has been treated for bouts of sinusitis, which resolved with medication, and reportedly uses inhalers due to asthma. However, she has had clear lungs without wheezes, rales, or rhonchi on repeated physical examinations (i.e., on August 15, 2010, February 7, 2011, June 14, 2011, August 23, 2011, March 1, 2012, and September 10, 2012). There is no imagine of the chest or spirometric testing demonstrating any respiratory abnormality. Further, the claimant has not required aggressive physician intervention, emergency room treatment, or hospitalization for respiratory problems; and there is no evidence of evaluation or treatment by a

pulmonary specialist. Thus, no listing level respiratory impairment is established by the evidence of record.

In finding no listing level musculoskeletal, neurological, respiratory, or other impairment, the undersigned concurs with State agency consulting physicians, who likewise determined on reviews of the evidence that the record does not establish any impairment of listing level severity (Exs. 7F, 11F). Furthermore, no treating or examining medical professional has specified an impairment of listing level severity.

(R. at 27-28.)

It is clear from the record that "the ALJ failed to discuss or even mention Plaintiff's fibromyalgia . . . at Step 3 in concluding that Plaintiff's impairments, singularly or in combination, failed to equal a listed impairment." Kinsey v. Colvin, No. 8:13-1723-BHH, 2014 WL 6090772, at *11 (D.S.C. Nov. 13, 2014); see also Cashin v. Colvin, No. 1:12CV909, 2013 WL 3791439, at *4-5 (N.D. Ohio July 18, 2013) (finding same). The ALJ should have done so after determining that Plaintiff's fibromyalgia was a severe impairment at Step Two of the sequential evaluation. (R. at 23.)

In her brief, Plaintiff states that the ALJ did not only "not mention the impairment of fibromyalgia in his Step 3 analysis, but he also did not compare [her] symptoms to the most obvious listing that fibromyalgia might equal–the one actually mentioned in SSR 12-2p: 14.09D, the listing for inflammatory arthritis." (Plaintiff's Brief at 12-13.) However, "SSR 12-2p does not require an ALJ to consider any specific listing, but simply requires him or her to consider a claimant's fibromyalgia against a relevant listing, citing Listing 14.09D as one such example." White v. Colvin, No. 4:12-cv-11600, 2013 WL 5212629, at *22 (E.D. Mich. Sept. 16, 2013). Accordingly, the undersigned cannot find that the ALJ erred simply because he did not explicitly compare Plaintiff's condition to Listing 14.09D.

The Commissioner argues that Plaintiff misreads SSR 12-2p when she argues that "the ALJ should have specifically addressed whether Plaintiff met or equaled the inflammatory arthritis Listing (Listing 14.09D) as a part of his fibromyalgia analysis." (Defendant's Brief at 10.) Defendant continues by offering evidentiary support and analysis in her brief to show that Plaintiff does not satisfy the criteria of Listing 12.09D. (Id. at 11.) However, the Commissioner has misread Plaintiff's contention, as Plaintiff is not solely alleging that the ALJ erred by failing to consider Listing 14.09D. As noted above, the ALJ failed to discuss or even mention Plaintiff's fibromyalgia at Step Three of the sequential evaluation. As to the Commissioner's arguments that Plaintiff cannot meet Listing 14.09D, "the ALJ did not include these assertions in his decision and the Court cannot engage in post hoc rationalizations." Cashin, 2013 WL 3791439, at *6 (citing S.E.C. v. Chenery, 332 U.S. 194, 196 (1947) ("a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency")).

Given the ALJ's failure to mention or discuss Plaintiff's fibromyalgia at Step Three of the sequential evaluation, the undersigned cannot conclude that the ALJ's determination that Plaintiff did not "have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1" (R. at 27) is supported by substantial evidence. Nor can the undersigned find that such error is harmless "because the Social Security regulations state that if a person's impairments meet or equal a Listing, she is disabled under the regulations and would be entitled to benefits with no further analysis required." Cashin, 2013 WL 3791439, at *6; see also Vest v. Colvin, No. 5:13CV00067, 2014 WL 4656207, at *27 (E.D. Va. Sept. 16, 2014) ("The mere fact that an ALJ properly found a claimant capable of

past work at step four or of other work at step five does not render an error at step three harmless; otherwise, step three errors would never be reversible alone, which is clearly not the case."). Accordingly, the undersigned agrees that the matter should be remanded for discussion of Plaintiff's fibromyalgia at Step Three.

**D.     Credibility**

In both claims for relief, Plaintiff asserts that the ALJ erred in assessing her credibility because he failed to include any discussion of her fibromyalgia. (Plaintiff's Brief at 7-11.) Specifically, Plaintiff alleges that the ALJ's "inappropriate reliance on the lack of objective medical evidence to discount [her] allegations of pain and fatigue and her significant limitations, as well as the fact that the ALJ completely omitted any analysis of [her] fibromyalgia was reversible error." (Id. at 10.) The undersigned has already found that the ALJ erred at Step Three of the sequential evaluation by failing to mention or discuss Plaintiff's fibromyalgia and whether it, alone or in combination with at least one other impairment, medically equaled a Listing. Accordingly, the undersigned declines to consider Plaintiff's arguments regarding the ALJ's credibility determination. However, upon remand, the ALJ should take into consideration Plaintiff's allegation of error and should consider the "longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'" SSR 12-2p, 2012 WL 3104869, at *6; see also Exum v. Astrue, No. SAG-11-2073, 2012 WL 5363445, at *2 (D. Md. Oct. 26, 2012) ("The ALJ did not consider the fact that fibromyalgia, as opposed to a credibility problem, might have explained any such discrepancy.").

## V.  RECOMMENDED DECISION

For the reasons stated above, I find that the Commissioner's decision denying the Plaintiff's application for Supplemental Security Income is not supported by substantial evidence, and I accordingly recommend that the Defendant's Motion for Summary Judgment be **DENIED**, and the Plaintiff's Motion for Summary Judgment be **GRANTED** and this action be **REMANDED** to the Commissioner for further action in accordance with this Report and Recommendation.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation.  28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to counsel of record

Respectfully submitted this ___/___ day of _December_ , 2014.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE